1  LAWRENCE J.H. LIU (SBN 312115)
   lawrence@frostllp.com
2  OHIA AMADI (SBN 268876)
   ohia@frostllp.com
3  FROST LLP
   10960 Wilshire Boulevard, Suite 2100
4  Los Angeles, California 90024
   Telephone: (424) 254-0441
5  Facsimile: (424) 600-8504

6  Attorneys for Plaintiff and the
   Putative Class
7  MARY DENMARK

8

9                  UNITED STATES DISTRICT COURT

10                 EASTERN DISTRICT OF CALIFORNIA

11

12  MARY DENMARK, and all similarly situated      Case No. 1:25-at-01344
    individuals,
13                                                **PLAINTIFF'S CLASS ACTION
                 Plaintiff,                       COMPLAINT**
14
        vs.
15
    700 CREDIT, LLC, and NORTH
16  BAKERSFIELD IMPORTS, LLC, d/b/a
    NORTH BAKERSFIELD TOYOTA
17
                 Defendant.
18

19

20

21

22

23

24

25

26

27

28

Plaintiff Mary Denmark ("Plaintiff"), individually and on behalf of all other similarly situated individuals (the "Class" or "Class Members," as defined below), by and through her undersigned counsel, files this Class Action Complaint against 700 Credit, LLC ("700 Credit") and North Bakersfield Imports, LLC d/b/a North Bakersfield Toyota ("NBT") (together, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following based on personal knowledge of facts, upon information and belief, and based on the investigation of his counsel as to all other matters.

## I.     **INTRODUCTION**

1.      Plaintiff brings this class action lawsuit against Defendants for their failure to protect and safeguard Plaintiff's and the Class's highly sensitive personally identifiable information ("PII").

2.      Defendant 700 Credit is the largest provider of credit reports, soft pull credit data, identity verification, fraud detection and compliance solutions for Automotive, RV, Powersports and Marine dealerships, including Defendant NBT ("Clients" or "Defendant's Clients").[1] 700 Credit transacts business across the county including California.

3.      Defendant NBT is a Toyota automotive dealership based in Bakersfield, California.[2]

4.      Upon information and belief, NBT contracts 700 Credit as a third-party vendor to provide credit reports for NBT's customers. NBT provides 700 Credit, directly or indirectly, with its customer's PII to run credit reports used to qualify car buyers.

5.      Plaintiff and Class Members are customers of NBT and were required to provide their PII to NBT and 700 Credit to run credit reports and soft pull credit data to determine their eligibility for automobile loans.

6.      As part of its regular business practices, 700 Credit collected, stored, and maintained the PII of its Clients' customers, including NBT.

---

[1] *About Us*, 700 Credit, LLC: https://www.700credit.com/about/ (last visited Dec. 17, 2025).
[2] https://www.northbakersfieldtoyota.com/ (last visited Dec. 17, 2025).

7.      Upon information and belief, 700 Credit collected, stored, and maintained the PII of Plaintiff and Class Members.

8.      Upon information and belief, in October 2025, 700 Credit experienced a Data Breach where an unknown third party gained access to 700 Credit's network environment and systems ("Data Breach" or "Breach").[3] Upon information and belief, the Data Breach impacted millions of individuals, including Plaintiff and Class Members, exposing their name, Social Security number, date of birth, and address (collectively, "Private Information") in the Breach.[4]

9.      700 Credit posted on its website information regarding the Data Breach.[5]

10.     700 Credit publicly confirmed that it was attacked by an unknown third party who had unauthorized access to the PII of its Clients' customers it stored.[6]

11.     Now, Plaintiff's and the Class's PII is in the hands of cybercriminals who will undoubtedly use their PII for nefarious purposes for the rest of their lives.

12.     As a condition of providing their Private Information to NBT to run their credit reports, Plaintiff and Class members were required to entrust their sensitive, non-public Private Information to NBT and to 700 Credit, directly or indirectly. 700 Credit in turn stored and used Plaintiff's and Class Members' Private Information to provide their contracted services to NBT.

13.     Businesses that store and maintain consumers' Private Information, like NBT and 700 Credit, owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from unauthorized disclosures and unauthorized third parties. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons, and especially hackers, will harm the affected individuals, including to the invasion of their private information and financial matters.

14.     In providing their Private Information to NBT and 700 Credit, Plaintiff and the Class Members reasonably expected these sophisticated business entities to keep their Private Information

---

[3] 700Credit Suffers Data Breach: https://www.700credit.com/notice/ (last visited Dec. 17, 2025).
[4] *Id.*
[5] *Id.*
[6] *Id.*

confidential and secured from unauthorized disclosures, to use this information for business purposes only, and to disclose it only as authorized. Defendants failed to do so, resulting in the unauthorized disclosure of Plaintiff's and Class Members' Private Information in the Breach.

15.     Despite 700 Credit discovering the Breach in October 2025, 700 Credit and NBT have delayed alerting victims of the Data Breach. Upon information and belief, Defendants are yet to send notice letters of the Breach to affected individuals.

16.     NBT failed to adequately protect Plaintiff's and Class Members' Private information and failed to ensure that its third party vendor, 700 Credit, would maintain adequate safeguards to protect NBT's customers' Private Information.

17.     Upon information and belief, due to NBT's and 700 Credit negligence, cybercriminals have accessed and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of millions of individuals.

18.     Now, and for the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Even those Class Members who have yet to experience identity theft have to spend time responding to the Breach and are at an immediate and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, deprivation of the value of their Private Information, loss of privacy, and/or additional damages as described below.

19.     Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of the data's value in exploiting and stealing their identities. As a direct and proximate result of Defendants' inadequate data security and breaches of their duties to handle Private Information with reasonable care, Plaintiff's and Class Members' Private Information was accessed by cybercriminals and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiff and Class Members as victims of the Data Breach will remain for their respective lifetimes.

20. In sum, Plaintiff and the Class will face an imminent risk of fraud and identity theft for the rest of their lives because: (i) Defendants failed to protect Plaintiff's and the Class's Private Information, allowing a large and preventable Data Breach to occur; (ii) the cybercriminals who perpetrated the Breach accessed Private Information that they will sell on the dark web (if they have not already) because that is the modus operandi of cybercriminals who perpetrate breaches such as this; and (iii) Defendants failed to timely notify Plaintiff and the Class of the Data Breach.

21. Plaintiff brings this action individually and on behalf of the Class, seeking compensatory damages, punitive damages, nominal damages, restitution, and injunctive and declaratory relief, reasonable attorney fees and costs, and all other remedies this Court deems proper.

## II.     THE PARTIES

22. Plaintiff **Mary Denmark** is a citizen and a resident of Bakersfield, California. Plaintiff is a former customer of North Bakersfield Toyota. Plaintiff provided her Private Information to 700 Credit, directly or indirectly through NBT, prior to the Data Breach as a condition of and in exchange for receiving services from Defendants. Upon information and belief, Plaintiff's Private Information was accessed and exfiltrated in the Data Breach and Plaintiff is therefore a victim of the Breach.

23. Defendant **700 Credit LLC** is a limited liability company with its headquarters and principal place of business located at 26555 Northwestern Highway, Suite 301, Southfield, Michigan, 48033. 700 Credit's registered agent is CSC-Lawyers Incorporating Service Company located at 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911. 700 Credit conducts business in California, through Defendant NBT, and collects, stores, and maintains the PII of individuals in California, including Plaintiff and Class Members.

24. Defendant **North Bakersfield Imports, LLC d/b/a North Bakersfield Toyota** is a corporation formed in Delaware with its principal place of business and headquarters located at 19651 Industry Parkway Dr., Bakersfield, California 93308.[7] The registered agent for service of process is Dennis W. Ghan and may be served at 1900 Main Street, Suite 700 Irvine, CA 92614.

---

[7] *See* https://www.bbb.org/us/ca/bakersfield/profile/car-dealers/north-bakersfield-toyota-1126-850080091 (last visited Dec. 17, 2025).

### III.    <u>JURISDICTION AND VENUE</u>

25.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

26.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, many of whom reside outside the state of California and have different citizenship from 700 Credit. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

27.    This Court has personal jurisdiction over Defendants because 700 Credit and NBT regularly conduct business in California, have sufficient minimum contacts in California, and purposely availed themselves to the Courts in this District.

28.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant NBT's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendants have harmed Class Members residing in this District.

### IV.    <u>FACTUAL ALLEGATIONS</u>

29.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

30.    NBT is a Toyota automotive dealership based in Bakersfield, California.[8] As part of its business practices, NBT contracted 700 Credit (or directly/indirectly instructed its customers to use 700 Credit services)  to run credit reports and soft credit inquiries for its customers looking to purchase a vehicle.

31.    In the course of NBT contract with 700 Credit, NBT provided 700 Credit with Plaintiff's and Class Members' Private Information (directly or indirectly), including name, address, Social Security number, and phone number.

---

[8] https://www.northbakersfieldtoyota.com/ (last visited Dec. 17, 2025).

32.     Plaintiff and Class Members are current and former customers of Defendants. As a condition of receiving Defendants' services and consumer products, Plaintiff and Class Members were required to provide NBT and 700 Credit with their sensitive and non-public Private Information.

33.     Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

34.     As part of their business practices, Defendants acquire a significant amount of highly sensitive Private Information from their customers, including the acquisition of the PII of Plaintiff and Class Members. Without the Private Information of Plaintiff and Class Members, Defendants would be unable to conduct business and generate revenue.

35.     Defendants obtained, collected, used, and derived a benefit from the Private Information of Plaintiff and Class Members. Defendants use the Private Information they collected to provide services, making a profit therefrom. Defendants would not be able to obtain revenue if not for the acceptance and use of Plaintiff's and the Class's Private Information.

36.      Defendants used Plaintiff's and Class Members' Private Information to operate their business and derive economic benefits and could not operate their business without that data.

37.     NBT's Privacy Policy on its website states "While we use encryption to protect online information, we also make all reasonable efforts to secure and protect your information offline. All of our customers' information is restricted in our offices and only employees who need the information to perform a specific job function are granted access to this information. The services that store your personal information are housed in a secure environment."[9] Thus NBT recognizes its duty and obligation to safeguard customers' PII.

38.     700 Credits' Privacy Policy on its website states "We exercise great care to protect your personally identifiable information. This includes, among other things, using industry standard

---

[9] North Bakersfield Toyota, Privacy Policy: https://www.northbakersfieldtoyota.com/privacy-policy/ (last visited Dec. 17, 2025).

techniques such as firewalls, encryption, intrusion detection and site monitoring."[10] Thus 700 Credit recognized its duty to safeguard customers' PII.

39.    In exchange for receiving Plaintiff's and Class Members' Private Information, Defendants promised to safeguard the sensitive and confidential data, to use it only for authorized and legitimate purposes, and to delete such information from their systems once there was no longer a need to maintain it.

40.    By collecting Plaintiff's and the Class's Private Information, Defendants assumed legal and equitable duties to Plaintiff and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

41.    Defendants recognized they had a duty to use reasonable measures to protect the Private Information that it collected and maintained.

42.    NBT owed a duty to protect Plaintiff and Class Members from the harm that NBT's third-party vendor's insufficient data security and the consequential exposure of Private Information would cause, because such harm was foreseeable and reasonably preventable.

43.    NBT knew, or should have known, 700 Credit was storing valuable, sensitive Private Information of its customers and that as a result, 700 Credit's systems would be an attractive target for cybercriminals.

44.    NBT also knew that any breach of 700 Credit's network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for its customers whose Private Information was compromised, as well as intrusion into their private and sensitive financial matters.

45.    As a result of collecting and storing the Private Information of Plaintiff and Class members of their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiff and the Class Members' Private Information from disclosure to unauthorized third parties.

---

[10] 700 Credit, Privacy Policy: https://www.700credit.com/privacy-policy/ (last visited Dec. 17, 2025).

46.    NBT's duty to protect Plaintiff and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would cause obligated NBT to require and ensure its credit-report third party vendor, 700 Credit, had implemented reasonable practices to keep Plaintiff's and Class Members' sensitive Private Information confidential and securely maintained, used and disclosed it for necessary and authorized purposes only, deleted the data from network systems or applications when no longer necessary for legitimate business purposes, and trained employees on reasonable cybersecurity red flags and protection techniques.

47.    The PII NBT shared with 700 Credit, or which NBT directed its customers to provide to 700 Credit, which 700 Credit stored on their network systems when the Data Breach occurred, included the unencrypted Private Information of Plaintiff and Class Members.

48.    NBT negligently failed to secure Plaintiff's and Class Members' Private Information and ensure that its third-party vendor, 700 Credit, had the adequate safeguards to protect Plaintiff's and Class Members' Private Information.

49.    700 Credit negligently failed to implement adequate safeguards to protect Plaintiff's and Class Members' PII it stored in its network and systems. As a result of Defendant's failure comply with industry standards regarding cybersecurity (as detailed below), Plaintiff and Class Members were injured and now face the imminent risk of identity theft and fraud for years to come.

50.    But for Defendants' promises to keep Plaintiff's and Class Members' Private Information secure and confidential, Plaintiff and Class members would not have entrusted their Private Information to Defendants.

51.    Plaintiff and Class members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

***The Data Breach***

52.    On or around December 2025, 700 Credit posted on its website information regarding the Breach. 700 Credit states in relevant part:

> 700Credit regrets to inform you that our industry was attacked again by a bad actor who had unauthorized access to some of our personally identifiable information (PII) including name, address and social security number. The investigation is ongoing

FROST

and most importantly there is no indication of any identity theft, fraud, or other misuse of information in relation to this event.

We have engaged cybersecurity experts who did not identify any impact on our internal network, and confirmed all activity is limited within the 700Dealer.com application layer. We confirm there is no operational impact on our business, and we are able to continue providing services as scheduled. We recently mailed a detailed letter to all impacted dealers and are in the process of notifying every impacted consumer.

We pledge to take extraordinary steps necessary to assist consumers and notify required parties on behalf of dealers. We timely notified the FBI and the FTC and confirmed with the FTC that 700Credit's filing on behalf of all dealers is sufficient to meet dealer obligations to notify the FTC. In addition, we will be notifying State AG offices on behalf of dealers. Impacted consumers will also be notified and offered credit monitoring services and assistance they may need. 700Credit has also been working directly with NADA.

We have established a dedicated line (866) 273-0345 to address any further questions. As a matter of policy, 700Credit cannot advise dealerships as to specific legal obligations so it may be necessary to consult with your counsel.[11]

53.     Despite 700 Credit investigation of the Data Breach concluding in October 2025, Defendants failed to timely notify Plaintiff and Class Members of the Data Breach.

54.     Omitted from 700 Credit notice were the details of the root cause of the Data Breach, the identity of the cybercriminals who perpetrated the Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur have not been shared with regulators or Plaintiff and Class members, who retain a vested interest in ensuring that their information remains protected.

55.     Additionally, the 700 Credit notice of the Breach omitted the perpetrators that accessed and exfiltrated Private Information and critical facts surrounding the Breach.

56.     700 Credit notice of the Breach amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

---

[11] 700Credit Suffers Data Breach: https://www.700credit.com/notice/ (last visited Dec. 17, 2025).

57.    Upon information and belief NBT has yet to send notice of the Breach to affected individuals.

58.    By collecting, storing, and maintaining the PII of Plaintiff and Class Members, Defendants owed a duty to Plaintiff and Class Members to protect and safeguard their Private Information from unauthorized disclosures.

59.    Plaintiff's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Defendants' deficient security for customers' data caused and allowed criminals to target and take files containing Plaintiff's and Class Members' inadequately protected, unencrypted Private Information from Simmons-Rockwell third-party vendor's possession through the Data Breach.

60.    Because Defendants had a duty to protect Plaintiff's and Class Members' Private Information, Defendants should have known through readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information. Thus, NBT had a duty to ensure that its customers' Private Information, stored with its vendor 700 Credit, was secured and protected from unauthorized disclosures to unauthorized third parties.

61.    Defendants could and should have prevented this Data Breach by ensuring the files and servers containing Plaintiff's and Class Members' Private Information were properly secured and encrypted but failed to do so.

62.    700 Credit could and should have prevented this Data Breach by protecting Plaintiff's and Class Members' Private Information through industry standard safeguards.

63.    Additionally, NBT could have prevented this Data Breach by examining 700 Credit's cybersecurity protocols and ensuring vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained but failed to do so.

64.    Plaintiff further believes that her Private Information and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

65.    All in all, Defendants failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access and exploitation.

66.    Defendants' actions represent a flagrant disregard of the rights of Plaintiff and the Class, both as to privacy and property.

### Defendants Failed to Comply with FTC Guidelines

67.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

68.    In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

69.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

70.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

71.    As evidenced by the Data Breach, 700 Credit failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices. 700 Credit's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA. Similarly, NBT failed to ensure that 700 Credit implemented adequate security practices to ensure the safety and protection of NBT's customer's PII.

72.    700 Credit was at all times fully aware of its obligation to protect the of its customers yet failed to comply with such obligations. Defendants were aware of the significant repercussions that would result from 700 Credit's failure to implement industry standard cybersecurity safeguards.

### Defendants Failed to Comply with Industry Standards

73.    Industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendants, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, 700 Credit failed to follow some or all of these industry best practices.

74.    Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, 700 Credit failed to follow these cybersecurity best practices and NBT failed to ensure that 700 Credit followed cybersecurity best practices.

75.    700 Credit failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC1, PR.AC-3,

PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

76.    700 Credit failed to comply with these accepted standards, thereby permitting the Data Breach to occur and NBT negligently failed to ensure that its customer's PII, stored in 700 Credit's network, was protected against unauthorized access.

### *Defendants Breached their Duty to Safeguard Plaintiff's and Class Members' PII*

77.    In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII of Class Members.

78.    700 Credit breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its data security practices. 700 Credit's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

  a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

  b. Failing to adequately protect customers' PII;

  c. Failing to properly monitor its own data security systems for existing intrusions;

  d. Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

  e. Failing to sufficiently train its employees and vendors regarding the proper handling of its customers PII;

  f. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

  g. Failing to adhere to industry standards for cybersecurity as discussed above; and

h.    Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' PII.

79.    NBT failed to ensure that 700 Credit complied with FTC guidelines for cybersecurity in violation of the FTCA.

80.    Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' PII by allowing cyberthieves to access 700 Credit's computer network and systems which contained unsecured and unencrypted Private Information of Plaintiff and Class Members.

81.    Had 700 Credit remedied the deficiencies in its information storage and security systems or those of its affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential PII.

***Defendants Should Have Known Cybercriminals Target PII to Carry Out Fraud and Identity Theft***

82.    The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[12] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

83.    Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

84.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or

---

[12] *See FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf (last visited on Oct. 27, 2023).

to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

85.    In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

86.    Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' PII to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

87.    For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[13] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

88.    Indeed, a robust cyber black market exists in which criminals openly post stolen PII on multiple underground Internet websites, commonly referred to as the dark web.

89.    The ramifications of Defendant's failure to keep its customers' PII secure are long-lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

90.    The value of PII is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy

---

[13] See IdentityTheft.gov, Federal Trade Commission, *available at* https://www.identitytheft.gov/Steps (last visited Oct. 27, 2023).

prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

91.    It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

92.    PII, including names and Social Security numbers, are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

93.    As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**The Data Breach Increases Victims' Risk of Identity Theft**

94.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

95.    The unencrypted PII of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted PII may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

96.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

---

[14] See "*Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*," GAO (June 2007), *available at* https://www.gao.gov/products/gao-07-737 (last visited Oct. 27, 2023)

97.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

98.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

99.     One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[15]

100.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

101.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII

---

[15] Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Oct. 30, 2023).

that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

102.    The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

103.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

104.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### Loss of Time to Mitigate Risk of Identity Theft and Fraud

105.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time have been lost.

106.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and resecuring their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

107.    These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[16]

108.    These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach,

---

[16] *See* United States Government Accountability Office, GAO-07-737, "*Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,*" (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited November 2, 2023).

FROST

including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[17]

109.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[18]

### *Diminution of Value of Plaintiff's and the Class Members' Private Information*

110.    PII is a valuable property right.[19] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII and PHI have considerable market value.

111.    An active and robust legitimate marketplace for PII exists. In 2019, the data brokering industry was worth roughly $200 billion.[20]

112.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[21]

113.    Consumers who agree to provide their web browsing history to the Nielsen

---

[17] *See* Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps (last visited Oct. 30, 2023).

[18] *See* "*Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Oct. 30, 2023) ("GAO Report").

[19] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial asserts.

[20] *See* **Error! Hyperlink reference not valid.**https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Oct. 30, 2023).

[21] *See* https://datacoup.com/ (last visited Oct. 30, 2023); and https://digi.me/what-is-digime/ (last visited Oct. 30, 2023)

Corporation can receive up to $50.00 a year.[22]

114.    Conversely, sensitive Private Information can sell for as much as $363 per record on the dark web according to the Infosec Institute.[23]

115.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

116.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

117.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

118.    The fraudulent activity resulting from the Data Breach may not come to light for years.

119.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if 700 Credit's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

120.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on 700 Credit's network, amounting to thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

121.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff

---

[22] *See* Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Oct. 30, 2023).

[23] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Oct. 30, 2023).

and Class Members.

***Plaintiff Mary Denmark's Damages***

122.    Plaintiff is a former client of North Bakersfield Toyota.

123.    In order to become a customer of NBT, Plaintiff Denmark was required to provide her PII to Defendants, including her name, sex, date of birth, and Social Security number.

124.    Upon information and belief, at the time of the Data Breach Defendants retained Plaintiff Denmark's PII in their system.

125.    Plaintiff Denmark is very careful about sharing her PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendants had she known of Defendants' lax data security policies.

126.    Plaintiff Denmark has noticed an increase in spam phone calls, emails, and texts which she did not receive prior to the Data Breach.

127.    As a result of the Data Breach Plaintiff Denmark made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

128.    Plaintiff Denmark suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of her PII; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

129.    The Data Breach has caused Plaintiff Denmark to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

130.    As a result of the Data Breach, Plaintiff Denmark anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

131.    As a result of the Data Breach, Plaintiff Denmark is at present risk and will continue to be at increased risk of identity theft and fraud, and other risks unique to genetic information theft, such as health insurance discrimination, for years to come.

132.    Plaintiff Denmark has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.    CLASS ALLEGATIONS

133.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

134.    Plaintiff brings all claims as class claims under Federal Rule of Civil Procedure 23. The requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3), Plaintiff asserts all claims on behalf of a nationwide class and a California sub-class defined as follows:

**Nationwide Class**

All individuals residing in the United States whose PII was accessed and/or disclosed in the Data Breach (the "Nationwide Class").

**California Subclass**

All individuals residing in the State of California whose PII was accessed and/or disclosed in the Data Breach (the "California Subclass").

135.    Collectively, the Nationwide Class and California Subclass shall be known as the "Class" unless otherwise specified herein.

136.    Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

137.    Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class and/or California Subclass, as well as add subclasses, before the Court determines whether certification is appropriate.

138.    The proposed Nationwide Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

139.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes that the proposed Class includes

millions of individuals who have been damaged by 700 Credit's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendants' records.

140.    **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a.   When Defendants actually learned of the Data Breach and whether their response was adequate;

b.   Whether Defendants failed to adequately safeguard Plaintiff's and Class Members' PII;

c.   Whether Defendants owed a duty to Plaintiff and the Class to adequately protect their PII, and whether they breached this duty;

d.   Whether Defendants breached their duties to Plaintiff and the Class as a result of the Data Breach;

e.   Whether Defendants failed to provide adequate cyber security;

f.   Whether Defendants knew or should have known that 700 Credit's computer and network security systems were vulnerable to cyber-attacks;

g.   Whether Defendants' conduct, including its failure to act, resulted in or was the proximate cause of the breach of its company network;

h.   Whether Defendants were negligent in permitting unencrypted PII of vast numbers of individuals to be stored within 700 Credit's network;

i.   Whether Defendants were negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach;

j.   Whether Defendants breached implied contractual duties to Plaintiff and Class Members to use reasonable care in protecting their PII;

k.   Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

l.  Whether Defendants continue to breach duties to Plaintiff and Class Members;

m.  Whether Plaintiff and the Class suffered injury as a proximate result of Defendants' negligent actions or failures to act;

n.  Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

o.  Whether Defendants' actions alleged herein constitute gross negligence, and whether Plaintiff and Class Members are entitled to punitive damages.

141.  **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the members of the Class sustained damages as a result of Defendants' uniform wrongful conduct. All had their PII compromised as a result of the Data Breach.

142.  **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and there are no defenses unique to Plaintiff. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

143.  **Risks of Prosecuting Separate Actions:** This case is appropriate for certification because prosecution of separate actions would risk either inconsistent adjudications which would establish incompatible standards of conduct for the Defendants or would be dispositive of the interests of members of the proposed Class. Furthermore, Defendants are still in possession of PII of the Plaintiff and the Class, and Defendants' systems are still vulnerable to attack—one standard of conduct is needed to ensure the future safety of PII in Defendants' possession.

144.  **Policies Generally Applicable to the Class:** This case is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards members of the Class and making final injunctive relief appropriate with respect to the proposed Class as a whole. Defendants' practices challenged herein apply to and affect the members of the Class uniformly, and Plaintiff's challenge to those practices hinges on Defendants' conduct with respect to the proposed Class as a whole, not on individual facts or law applicable only to Plaintiff.

145.    **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the members of the Class. The injuries suffered by each individual member of the Class are relatively small in comparison to the burden and expense of individual prosecution of the litigation necessitated by Defendants' conduct. Absent a class action, it would be virtually impossible for individual members of the Class to obtain effective relief from Defendants. Even if members of the Class could sustain individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties, including the Court, and would require duplicative consideration of the common legal and factual issues presented here. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court.

146.    All members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## VI.    <u>CAUSES OF ACTION</u>

**COUNT I**

**NEGLIGENCE and NEGLIGENCE *PER SE***

**<u>(On Behalf of Plaintiff and the Class)</u>**

147.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

148.    Defendants require their customers, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing their services.

149.    Defendants gathered and stored the PII of Plaintiff and Class Members as part of their business of soliciting their services to their customers which solicitations and services affect commerce.

150.    Plaintiff and Class Members entrusted Defendants with their PII with the understanding that Defendants would safeguard their information.

151.    Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

152.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

Defendants' duty included a responsibility to exercise due diligence in selecting IT vendors and to audit, monitor, and ensure the integrity of its vendor's systems and practices and to give prompt notice to those affected in the case of a data breach.

153.    700 Credit had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data. NBT had a duty to ensure that 700 Credit, in possession of NBT's customers PII, implemented security safeguards and followed FTC guidelines.

154.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that 700 Credit's systems and networks, and the personnel responsible for them, adequately protected Plaintiff's and Class Members' PII.

155.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between 700 Credit and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted 700 Credit and NBT with their confidential PII, a necessary part of being customers of Defendants.

156.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII.

157.    Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

158.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII they was no longer required to retain pursuant to regulations.

159.    Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

160.    Defendants had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

161.    700 Credit breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members'

PII. Similarly, NBT breach its duties by failing to ensure that 700 Credit maintained proper security for its customer's PII. The specific negligent acts and omissions committed by 700 Credit include, but are not limited to, the following:

    a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.   Failing to adequately monitor the security of their networks and systems;

    c.   Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

    d.   Allowing unauthorized access to Class Members' PII;

    e.   Failing to detect in a timely manner that Class Members' PII had been compromised;

    f.   Failing to remove former customers' PII and it was no longer required to retain pursuant to regulations; and

    g.   Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

162.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

163.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

164.    Defendants' violations of Section 5 of the FTC Act constitute negligence *per se*.

165.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

166.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of 700 Credit's inadequate security practices.

167.    It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was

reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

168.    Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if they were wrongfully disclosed.

169.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting PII stored on Defendants' systems.

170.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

171.    Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

172.    Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

173.    Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

174.    But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

175.    There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

176.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued

and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and the Class Members' PII.

177.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

178.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

179.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

180.    Defendants' negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

181.    Plaintiff and Class Members are also entitled to injunctive relief requiring 700 Credit to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

182.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

183.    Plaintiff and Class Members were required to provide their PII to Defendants as a condition of receiving services from Defendants.

184.    Plaintiff and the Class entrusted their PII to Defendants. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

185.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that 700 Credit's data security practices complied with relevant laws and regulations and were consistent with industry standards.

186.    Implicit in the agreement between Plaintiff and Class Members and the Defendants to provide their PII, was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the Private Information only under conditions that kept such information secure and confidential.

187.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants, on the other, is demonstrated by their conduct and course of dealing.

188.    Defendants solicited, offered, and invited Plaintiff and Class Members to provide their PII as part of Defendants' regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their PII to Defendants.

189.    In accepting the PII of Plaintiff and Class Members, Defendants understood and agreed that they were required to reasonably safeguard the PII from unauthorized access or disclosure.

190.    On information and belief, at all relevant times Defendants promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that they would only disclose Private Information under certain circumstances, none of which relate to the Data Breach.

191.    On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

192.    Plaintiff and Class Members paid money and provided their PII to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendants failed to do so.

193.    Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

194.    Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

195.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

196.    Defendants breached the implied contracts they made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

197.    As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

198.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

199.    Plaintiff and Class Members are also entitled to injunctive relief requiring 700 Credit to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III

## UNJUST ENRICHMENT

## (On Behalf of Plaintiff and the Class)

200.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

201.    This count is pleaded in the alternative to the Breach of Implied Contract claim above (Count II).

202.    Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, they paid for services from Defendants and in doing so also provided Defendants with their PII and PHI. In exchange, Plaintiff and Class Members should have received from Defendants the services that were the subject of the transaction and should have had their PII protected with adequate data security.

203.    Defendants knew that Plaintiff and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the PII entrusted to them.

Defendants profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

204.   Defendants failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

205.   700 Credit acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

206.   If Plaintiff and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would have never entrusted their Private Information with Defendants.

207.   Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

208.   As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in 700 Credit's possession and is subject to further unauthorized disclosures so long as 700 Credit fails to undertake appropriate and adequate measures to protect the Private Information.

209.   Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

210.   Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**CAL. BUS. & PROF. CODE § 17200, *et seq.***

**(On Behalf of Plaintiff and the California Subclass)**

211.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

212.    Defendants' acts and omissions as alleged herein emanated and directed from California.

213.    By reason of the conduct alleged herein, Defendants engaged in unlawful and unfair business practices within the meaning of California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, *et seq*.

214.    700 Credit stored the Private Information of Plaintiff and Class Members in its computer systems.

215.    700 Credit knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with federal regulations that would have kept Plaintiff's and Class Members' Private Information secure and prevented the loss or misuse of that Private Information.

216.    700 Credit and NBD did not disclose at any time that Plaintiff's and Class Members' Private Information was vulnerable to hackers because 700 Credit's data security measures were inadequate and outdated, and Defendants were the only ones in possession of that material information, which Defendants had a duty to disclose.

***Unlawful Business Practices***

217.    As noted above, 700 Credit violated Section 5(a) of the FTC Act (which is a predicate legal violation for this UCL claim) by misrepresenting, by omission, the safety of their computer systems, specifically the security thereof, and their ability to safely store Plaintiff's and Class Members' Private Information. NBT also failed to ensure that 700 Credit had adequate security safeguards to protect PII and failed to disclose to Plaintiff and Class Members that 700 Credit did not had sufficient security to protect the PII of Plaintiff and Class Members.

218.    700 Credit also violated Section 5(a) of the FTC Act by failing to implement reasonable and appropriate security measures or follow industry standards for data security.

219.    If 700 Credit had complied with these legal requirements, Plaintiff and Class Members would not have suffered the damages related to the Data Breach, and consequently from Defendants' failure to timely notify Plaintiff and Class Members of the Data Breach.

220.    Defendants' acts and omissions as alleged herein were unlawful and in violation of, inter alia, Section 5(a) of the FTC Act.

221.    Plaintiff and Class Members suffered injury in fact and lost money or property as the result of Defendants' unlawful business practices. In addition, Plaintiff's and Class Members' Private Information was taken and is in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value.

222.    Plaintiff and Class Members have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

### *Unfair Business Practices*

223.    Defendants engaged in unfair business practices under the "balancing test." The harm caused by Defendants' actions and omissions, as described in detail above, greatly outweigh any perceived utility. Indeed, 700 Credit's failure to follow basic data security protocols and Defendants' failure to disclose inadequacies of 700 Credit's data security cannot be said to have had any utility at all. All of these actions and omissions were clearly injurious to Plaintiff and Class Members, directly causing the harms alleged above.

224.    Defendants engaged in unfair business practices under the "tethering test." Defendants' actions and omissions, as described in detail above, violated fundamental public policies expressed by the California Legislature. *See*, e.g., Cal. Civ. Code § 1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendants' acts and omissions thus amount to a violation of the law.

225.    Defendants engaged in unfair business practices under the "FTC test." The harm caused by Defendants' actions and omissions, as described in detail above, is substantial in that it affects hundreds of thousands of California Class Members and has caused those persons to suffer

actual harm. Such harms include a substantial risk of identity theft, disclosure of Plaintiff's and Class Members' Private Information to third parties without their consent, diminution in value of their Private Information, consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, loss of time reviewing and monitoring their financial accounts, and other expenses relating to identity theft losses or protective measures. This harm continues given the fact that Plaintiff's and Class Members' Private Information remains in Defendants' possession, without adequate protection, and is also in the hands of those who obtained it without their consent. Defendants' actions and omissions violated Section 5(a) of the Federal Trade Commission Act. *See* 15 U.S.C. § 45(n) (defining "unfair acts or practices" as those that "cause[ ] or [are] likely to cause substantial injury to consumers which [are] not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition"); *see also, e.g., In re LabMD, Inc.*, FTC Docket No. 9357, FTC File No. 102-3099 (July 28, 2016) (failure to employ reasonable and appropriate measures to secure personal information collected violated §5(a) of FTC Act).

226.    Plaintiff and Class Members suffered injury in fact and lost money or property as the result of Defendants' unfair business practices. Plaintiff's and Class Members' Private Information was taken and in the hands of those who will use it for their own advantage, or is being sold for value, making it clear that the hacked information is of tangible value. Plaintiff and Class Members have also suffered consequential out-of-pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

227.    As a result of Defendants' unlawful and unfair business practices in violation of the UCL, Plaintiff and Class Members are entitled to damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT V**

**VIOLATIONS OF THE CALIFORNIA CUSTOMER RECORDS ACTS**

**CAL. CIV. CODE § 1798.80, *et seq.***

**(On Behalf of Plaintiff and the California Subclass)**

228.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

229.    This count is brought on behalf of the Nationwide Class or, alternatively, the California Sub-Class.

230.    Section 1798.82 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under section 1798.82, the disclosure "shall be made in the most expedient time possible and without unreasonable delay . . . ."

231.    The CCRA further provides: "Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b).

232.    Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

    a.  The security breach notification shall be written in plain language;

    b.  The security breach notification shall include, at a minimum, the following information:

        i.  The name and contact information of the reporting person or business subject to this section;

        ii.  A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

        iii.  If the information is possible to determine at the time the notice is provided, then any of the following:

            1.  The date of the breach;

            2.  The estimated date of the breach; or

            3.  The date range within which the breach occurred. The notification shall also include the date of the notice.

        iv.  Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

        v.  A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

vi.    The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

233.    The Data Breach described herein constituted a "breach of the security system" of Defendant.

234.    As alleged above, Defendants unreasonably delayed informing Plaintiff and Class Members about the Data Breach, affecting their PII, after Defendants knew the Data Breach had occurred.

235.    Defendants failed to disclose to Plaintiff and Class Members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, PII when Defendants knew or reasonably believed such information had been compromised.

236.    Defendants' ongoing business interests gave Defendants incentive to conceal the Data Breach from the public to ensure continued revenue.

237.    Upon information and belief, no law enforcement agency instructed Defendants that timely notification to Plaintiff and the Class Members would impede its investigation.

238.    As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiff and Class Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiff and Class Members because their stolen information would have had less value to identity thieves.

239.    As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiff and Class Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

240.    Plaintiff and Class Members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to the damages suffered by Plaintiff and the other Class Members as alleged above and equitable relief.

241.    Defendants' misconduct as alleged herein is fraud under Cal. Civ. Code § 3294(c)(3) in that it was deceit or concealment of a material fact known to the Defendants conducted with the intent on the part of Defendants of depriving Plaintiff and Class Members of "legal rights or otherwise causing injury." In addition, Defendants' misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) in that it was despicable conduct carried

on by Defendants with a willful and conscious disregard of the rights or safety of Plaintiff and Class Members and despicable conduct that has subjected Plaintiff and Class Members to hardship in conscious disregard of their rights. As a result, Plaintiff and Class Members are entitled to punitive damages against Defendants under Cal. Civ. Code § 3294(a).

## COUNT VI

## VIOLATIONS OF CALIFORNIA'S CONSUMER PRIVACY ACT

## CAL. CIV. CODE § 1798.100, *et seq.*

## (On Behalf of Plaintiff and the California Subclass)

242.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

243.    This count is brought on behalf of the California Sub-Class.

244.    Through the above-detailed conduct, Defendants violated California's Consumer Privacy Act ("CCPA") (Cal. Civ. Code § 1798.100, et seq.) by subjecting the nonencrypted and nonredacted PII of Plaintiff and Class Members to unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing as a result of Defendants' violation of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature and protection of that information. Cal. Civ. Code § 1798.150(a).

245.    In accordance with Cal. Civ. Code § 1798.150(b), on conjunction with the filing of this Complaint, Plaintiff's counsel served Defendant with notice of these CCPA violations by certified mail, return receipt requested.

246.    On behalf of Class Members, Plaintiff seeks injunctive relief in the form of an order enjoining Defendants from continuing to violate the CCPA. If Defendants fails to respond to Plaintiff's notice letter or agree to rectify the violations detailed above, Plaintiff also will seek actual, punitive, and statutory damages, restitution, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendants' CCPA violations.

## COUNT VII

## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT

## (On Behalf of Plaintiff and the Class)

247.    Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

248.    700 Credit entered into contracts, written or implied, with its Clients to perform services, including NBT. Upon information and belief, these contracts are virtually identical

between and among 700 Credit and its Clients around the country whose customers, including Plaintiff and Class Members, were affected by the Data Breach.

249.    In exchange, 700 Credit agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

250.    These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between 700 Credit and its Clients, including NBT. 700 Credit knew that if it were to breach these contracts with its Clients and its Clients' customers—Plaintiff and Class Members—would be harmed.

251.    700 Credit breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiff and Class Members thereof.

252.    Plaintiff and the Class were harmed by 700 Credit's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

253.    Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff and the Class pray for judgment against Defendants as follows:

A.  For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class and California Subclass, pursuant to Federal Rule of Civil Procedure 23;

B.  For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.  For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.  For an award of actual damages, compensatory damages, and nominal damages, in an

amount to be determined, as allowable by law;

E.  For an award of punitive damages, as allowable by law;

F.  For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.  Pre- and post-judgment interest on any amounts awarded; and

H.  Such other and further relief as this court may deem just and proper.

DATED:  December 18, 2025                    FROST LLP


By: _____

LAWRENCE J.H. LIU
OHIA AMADI
Attorneys for Plaintiff and the
Putative Class
MARY DENMARK

PLAINTIFF'S CLASS ACTION COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2        Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Complaint.

3

4  DATED:  December 18, 2025        FROST LLP

5

6

7                      By: _____
                        LAWRENCE J.H. LIU

8                        OHIA AMADI
                        Attorneys for Plaintiff and the

9                        Putative Class
                        MARY DENMARK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S CLASS ACTION COMPLAINT